UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA L. P.,[1] <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, Commissioner of Social Security Administration, <br><br> Defendant. | Case No. 2:24-cv-01221-JC <br><br> MEMORANDUM OPINION |

## I.  SUMMARY

On February 14, 2024, Plaintiff Christina L. P. filed a Complaint seeking review of the Commissioner of Social Security's denial of Plaintiff's application for benefits.  The parties have consented to proceed before the undersigned United States Magistrate Judge.

///

///

---

[1] Plaintiff's name is partially redacted to protect Plaintiff's privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

This matter is before the Court on the parties' cross-briefs (respectively, "Plaintiff's Brief," "Defendant's Brief," and "Plaintiff's Reply") which the Court has taken under submission without oral argument.

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED. The findings of the Administrative Law Judge ("ALJ") are supported by substantial evidence and are free from material error.

## II.     BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On April 1, 2019, Plaintiff, a former administrative clerk with a significant work history, filed an application for Disability Insurance Benefits alleging disability beginning on September 20, 2018, due to a kidney transplant, lupus, thyroid cancer in remission, stress, and insomnia. (Administrative Record ("AR") 155-56, 233-41, 243-44). Plaintiff's claim was denied on initial and reconsideration review. (AR 48-73).

An ALJ then examined the medical record and, on February 11, 2021, heard testimony from Plaintiff and a vocational expert. (AR 28-47). On March 30, 2021, the ALJ determined Plaintiff was not disabled since the alleged onset date. (AR 15-23 (finding Plaintiff retained a residual functional capacity ("RFC")[2] for a range of sedentary work which would permit her to perform her past relevant work, and rejecting Plaintiff's testimony and statements suggesting greater limitations)). On August 18, 2021, the Appeals Council denied Plaintiff's request for review. (AR 1-3).

Plaintiff sought judicial review in Christina [L. P.] v. Kijakazi, C.D. Cal. Case No. 2:21-cv-7206. (AR 953-56, 958-60). On March 28, 2022, the case was remanded for further administrative proceedings upon the parties' stipulation. (AR 961-63).

---

[2] A RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

On September 17, 2022, the Appeals Council vacated the Commissioner's final decision and remanded the case to an ALJ to further evaluate Plaintiff's subjective complaints under 20 C.F.R. § 404.1529. See AR 966-68 (finding the ALJ's March 30, 2021 decision did not provide adequate reasoning for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ had found to exist).  The Appeals Council noted in part that the ALJ should reevaluate Plaintiff's reports of fatigue given "numerous" references in the record which appeared to support Plaintiff's allegations of fatigue.  (AR 966-67 (citing AR 467 (July 2020 letter from Dr. Joshua Levy stating that Plaintiff was "under heavy medication to prevent kidney rejection" with "secondary symptoms of weakness, fatigue and difficulty concentrating due to her medications"); AR 355 (Dr. Levy's October 2018 progress report stating that Plaintiff has no arthritis but "suffers [joint] pain and fatigue"); AR 425-26, 430 (Dr. Levy's treatment notes supposedly reporting "fatigue secondary to lupus")).[3]

On September 5, 2023, the same ALJ heard testimony from Plaintiff and a vocational expert.  (AR 936-52).  On December 28, 2023, the ALJ once again found Plaintiff was not disabled since the alleged onset date.  (AR 917-28).  This time, the ALJ found in relevant part:  (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset (AR 920); (2) Plaintiff suffered from the following severe impairments:  chronic kidney disease with residuals from a kidney transplant, lupus, residuals from thyroid cancer, hypertension with coronary disease, and
///

---

[3]Dr. Levy's August 2020 handwritten treatment note actually states that Plaintiff had "SLE, mod[erate] Azotemia post renal transplant for renal failure 2∘ [secondary] to lupus nephritis.  As present no SLE findings."  (AR 425).  His other notes the Appeals Council cited contain similar reports and do not mention fatigue.  See AR 426 (June 2020 note stating, "SLE, mod[erate] Azotemia post renal transplant for renal failure 2∘ to lupus nephritis"); AR 430 (July 2019 note stating, "SLE post renal transplant after renal failure 2∘ to lupus nephritis, doing well").

diabetes (AR 920-23); (3) Plaintiff's impairments, considered individually or in combination, did not meet or medically equal a listed impairment (AR 923); (4) Plaintiff retained a RFC to perform sedentary work (20 C.F.R. § 404.1567(a)) with additional limitations[4] (AR 923-27 (finding not persuasive opinions from Plaintiff's treating nephrologists and rheumatologist, and adopting a RFC more restrictive than the consultative examiner's and state agency physicians' "somewhat persuasive" opinions that Plaintiff would be capable of a range of light work); (5) Plaintiff could perform her past relevant work as an administrative clerk as actually performed (AR 927-28 (adopting vocational expert testimony at AR 949-51)); and (6) Plaintiff's statements regarding the intensity, persistence, and limiting effects of subjective symptoms were not entirely consistent with the evidence (AR 924-26).

## III.   APPLICABLE LEGAL STANDARDS

### A.   Administrative Evaluation of Disability Claims

To qualify for disability benefits, a claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To be considered disabled, a claimant must have an impairment of such severity that she is incapable of performing work the claimant previously performed ("past relevant work") as well as

---

[4]Specifically, the ALJ limited Plaintiff to work with:  (1) occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs; (2) no climbing of ladders, ropes, or scaffolds; (3) occasional exposure to hazards such as unprotected heights or moving machinery; and (4) frequently, but not constantly, pushing and pulling.  (AR 923).

any other "work which exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations. See Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof at steps one through four – i.e., determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4). Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). The Commissioner has the burden of proof at step five – i.e., establishing that the claimant could perform other work in the national economy. Id.

### B.   Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record." 42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). The standard of review in disability cases is "highly deferential." Rounds v. Comm'r of Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted). Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision. Trevizo, 871 F.3d at 674-75 (citations omitted). Even when an ALJ's decision contains error, it must be affirmed if the error was harmless. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate

///

nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

## IV.   DISCUSSION

Plaintiff contends that in determining her RFC, the ALJ erred in evaluating her treating nephrologists' and rhematologist's opinions and Plaintiff's testimony suggesting greater limitations than the ALJ found to exist. (Plaintiff's Brief at 2-19; Plaintiff's Reply at 1-2). For the reasons explained below, Plaintiff has not shown that reversal or remand is warranted.

### A.        Summary of the Treatment Record

Plaintiff suffers from systemic lupus erythmus ("SLE" or lupus) with acute renal failure.  Her reported symptoms sometimes have included joint pain and fatigue.  See, e.g., AR 355, 421, 1612, 1616, 1621; compare AR 510, 523, 1093, 1100, 1225-26, 1253-54, 1259, 1263, 1269, 1280-81, 1611, 1615, 1620 (treatment notes stating that Plaintiff denied joint pain and/or fatigue/lethargy).  Lupus, a rheumatologic disorder, "is a type of autoimmune disease in which the immune system attacks its own tissues.  The kidney is an organ that is often affected. . . ." Catherine L. B. v. Comm'r, Soc. Sec. Admin., 2025 WL 1622195, at *5 (D. Or. June 9, 2025) (noting that a rheumatologist is an appropriate specialist to opine on whether a claimant's SLE explains fatigue and pain).

Plaintiff had a kidney transplant in 2001.  (AR 392).  She also had thyroid cancer and had a thyroidectomy in 2013.  (AR 392).  Plaintiff nonetheless was able to work full-time from 2002 until September 2018.  (AR 261-65).  A renal transplant outpatient clinic note from July 2018, notes that Plaintiff was "feeling well" and "doing well" with no urinary issues, no health issues, and no gastrointestinal issues.  (AR 392).  She reportedly exercised regularly.  (AR 392). She had no joint tenderness or swelling on examination, no edema, and no renal tenderness.  (AR 393).  She had stable allograft function with creatinine under her baseline, well-controlled hypertension, normalized hypocalcemia, "good" thyroid function tests, and no recent lupus flares.  (AR 395).  She was to return in one year. (AR 395).  When Plaintiff returned to the clinic in July 2019, and she again notedly was "feeling well" and "doing well," had no urinary or health issues, no joint tenderness or swelling, and no edema, and her other findings were unchanged from the prior visit. (AR 549-53).  She returned in February 2022, reporting she was "feeling well." (AR 1189).  Her examination findings were within normal limits, her creatinine was back down to baseline, and she would be considered for a decrease in her immunosuppression medications when she followed up.  (AR 1191, 1195).

Plaintiff has been treated by a number of specialists for her conditions.  Their available treatment notes are summarized below.

### 1.     Primary Care Dr. George Fischmann

There are treatment notes from primary care Dr. George Fischmann from October 2012 to October 2018.  (AR 496-913).  From the relevant time period, Dr. Fischmann reported in an August, 2018 treatment note that Plaintiff's thyroid condition remained "completely stable" – she had reported in July 2018 excellent energy and that she went to the gym four days a week.  (AR 510).  Plaintiff "continue[d] to do really well" after her kidney transplant – she had seen "gradual improvement" which Dr. Fischmann believed reflected her excellent diet, efforts at weight loss and "overall regulation."  (AR 510).  She "remained stable."  (AR 510).  Plaintiff had been seen in the renal clinic in July, and her status notedly was "extremely stable."  (AR 510-11; see also AR 392-95 (note from renal clinic)).  Plaintiff's lupus also "remained stable" – she reportedly had "remain[ed] free of issues," and a lupus profile from March 2018 was "completely negative."  (AR 510).  Plaintiff reported no fatigue and that she was walking one hour a day, four days a week.  (AR 510).  She had normal muscle strength and tone and a normal gait. (AR 511).  She was very stressed secondary to the loss of her job.  (AR 511).

In October 2018, Dr. Fischmann again noted that Plaintiff's renal functioning remained stable, she would have blood work for her thyroid functioning, and she would be following up with Dr. Levy for her lupus.  (AR 522-23).  She again reported no fatigue, and that she was exercising one hour a day, four days a week, and she had normal muscle strength, tone, and gait.  (AR 523-24).  Dr. Fischmann noted that Plaintiff continued to do "remarkably well" after her kidney transplant, her hypertension was stable and under "excellent control," her lupus was stable and her most recent serologies were negative, and he changed Plaintiff's thyroid medication because her current medication had been recalled.  (AR 524).

///

8

## 2.   Rheumatologist Dr. Joshua Levy

There are mostly handwritten hard-to-read treatment notes from rheumatologist Dr. Joshua Levy from October 2018 through October 2020, and typed notes from June 2022 through June 2023.  (AR 355, 424-86, 1252-83).  Plaintiff usually treated with Dr. Levy every two or three months and he ordered/reviewed tests and adjusted her medications accordingly.  (Id.).  Examination findings were within normal limits as detailed below.  (Id.).

In October 2018, one month after the alleged onset date, Plaintiff notedly had mild azotemia,[5] no rash, fever, or arthritis, but complained of joint pain and fatigue.  (AR 355).  Her examination was within normal limits – she was not in acute distress, she had no active synovitis,[6] and she had normal range of motion.  (AR 355).  Dr. Levy continued Plaintiff's medications, ordered more testing, and instructed her to follow up in three months.  (AR 355).

The next available treatment note is from May 2019, seven months later.  (AR 431).  Dr. Levy noted that Plaintiff continued to be stable with mild azotemia.  (AR 431).  She had no rash, fever, or arthritis.  (AR 431).  Plaintiff returned in July 2019, and reportedly was "doing well," and had no rash, fevers, or arthritis.  (AR 430).  In November 2019, Plaintiff reportedly was "doing well," with stable creatinine, and no rash, fevers, or arthritis.  (AR 429).  In February 2020, her renal function reportedly was stable, she had mild azotemia, and no rashes, fevers, or arthritis.  (AR 428).  In May 2020, she had azotemia, and no rashes, fevers, or arthritis.  (AR 427).  Her "self-examination" was within normal limits.  (AR 427).

---

[5]Azotemia is "an excess of nitrogen waste products in the blood."  See https://medical-dictionary.thefreedictionary.com/azotemia  (last visited Jan. 22, 2026).

[6]Synovitis is "inflammation of a synovial membrane, usually painful, particularly on motion, and characterized by fluctuating swelling, due to effusion in a synovial sac.  It may be caused by rheumatic fever, rheumatoid arthritis, tuberculosis, trauma, gout, or other conditions."  See https://medical-dictionary.thefreedictionary.com/synovitis (last visited Jan. 22, 2026).

In June 2020, she had moderate azotemia, and no rashes, fevers, or arthritis, but complained of edema in her left foot and redness in her left foot and calf.  (AR 426). Dr. Levy ordered compression stockings and continued Plaintiff's medications. (AR 426).  In August 2020, Dr. Levy noted Plaintiff had no lupus features "at present," but had moderate azotemia.  (AR 425).

In October 2020, Plaintiff had moderate azotemia but was stable with no lupus features, and slightly improved renal functioning from the last visit.  (AR 424).  She complained of joint aches mainly in her knees and hands.  (AR 424).  Her creatinine was down from a prior reading.  (AR 424).  She had a normal self-examination.  (AR 424).  Dr. Levy continue Plaintiff's medications and instructed her to follow up in two months. (AR 424).

The next available note is from June 2022 – over a year and a half later.  (AR 1256-60).  The treatment notes from this date forward are more detailed.  (AR 1252-82).  Plaintiff denied lupus flares, reported she was stable, had no fevers, and was "negative" for lethargy.  (AR 1256-60).  Dr. Levy continued Plaintiff's medications, ordered more testing, and counseled Plaintiff on avoiding sun exposure and using sun block.  (AR 1256, 1258).

In August 2022, Plaintiff's lupus again was stable and she denied any flare-ups, rashes, fevers, or chills.  (AR 1261).  She was "negative" for lethargy.  (AR 1263).  She complained of leg pain for which she was advised to take supplements and Tylenol.  (AR 1261, 1264).   In October 2022, Plaintiff denied fevers, rashes, joint pain or swelling, was "negative" for lethargy, and had pain at 0/10.  (AR 1266-70).

In December 2022, Plaintiff denied rash, fevers, and joint swelling.  (AR 1272-74).  She complained of back pain and widespread joint pain due to cold weather at 5/10.  (AR 1274-75).  Dr. Levy again advised Plaintiff to take supplements and Tylenol.  (AR 1274-75).

///

In April 2023, Plaintiff denied rashes, fevers, and joint pain/swelling, was "negative" for lethargy, and her pain was 0/10. (AR 1278-83). Dr. Levy continued Plaintiff's medications, ordered more testing, and counseled Plaintiff on diet and exercise. (AR 1281). In June 2023, Plaintiff again denied joint rashes, fevers, joint pains/swelling, was "negative" for lethargy, and her pain was 0/10. (AR 1252-54).

### 3. Nephrologist Dr. Pascal Dabel

There are treatment notes from nephrologist Dr. Pascal Dabel from June 2019 through September 2020. (AR 421-22, 489-93). In June 2019, Plaintiff notedly had edema and obesity. (AR 422). Among other things, Dr. Dabel ordered diet, hydration, testing, and continued Plaintiff's medications. (AR 422). When she followed up in September 2019, Plaintiff reported she "fe[lt] well," but she notedly had insomnia and fatigue. (AR 421). Her thyroid hormone level was 21.35. (AR 421). Dr. Dabel ordered diet, hydration, increased Plaintiff's synthroid dose for her thyroid functioning, and continued Plaintiff's other medications. (AR 421). In November 2019, and February, May, July, and September 2020, Plaintiff again reportedly "fe[lt] well," but had trace edema. (AR 489-93). Dr. Dabel ordered diet, exercise, weight loss, hydration, and continued medications. (AR 489-93).

There are "After Visit Summaries" in the record which do not detail visits other than conditions addressed. (AR 1160-66, 1171-75, 1185-88, 1197-1215). From March 2021 to December 2022, Plaintiff reportedly presented for persistently higher than normal blood pressure, chronic kidney disease, swelling, chronic long-term connective tissue inflammation, blood that lacks enough healthy red blood cells, high amounts of protein in her urine, excessive body fat, increased acids in body fluids and tissues, and an underactive thyroid gland. (AR 1185, 1187, 1197, 1200, 1204, 1207, 1212).

### 4. Primary Care Dr. Samuel Fink

There are treatment notes from Dr. Samuel Fink from June 2021 to November 2023. (AR 1287-1310). At the outset of treatment, Plaintiff considered her health

to be "average." (AR 1310). She reported that she was a homemaker and could not work given her multiple diagnoses. (AR 1310). Her examination was within normal limits except that her blood pressure was a little high. (AR 1309-10). Dr. Fink noted that Plaintiff may be prediabetic. (AR 1310). Dr. Fink referred Plaintiff to a dietician for weight loss and ordered coronary testing given Plaintiff's risk factors. (AR 1309). Stress testing showed Plaintiff could undergo test conditions for over eight minutes. (AR 1308). Dr. Fink adjusted Plaintiff's medications and started her on daily aspirin given her coronary disease. (AR 1308).

In August 2021, Dr. Fink adjusted Plaintiff's medication based on her labs and noted examination findings within normal limits. (AR 1307). In September and October, he reported that Plaintiff had lost weight and her examinations again were within normal limits. (AR 1305-07). Dr. Fink noted that Plaintiff had diabetes from her lab work for which she would start insulin, her thyroid medication would be adjusted, and she would be referred to a cardiologist for pericardial effusion. (AR 1304-06). She had normal blood pressure reports from home. (AR 1305).[7]

In November 2021, Plaintiff reported that her blood pressure had been fine. (AR 1304). She was on long acting insulin. (AR 1304). Examination findings were within normal limits. (AR 1303-04). Her thyroid hormone levels were elevated and her medications had been increased. (AR 1303). Dr. Fink told Plaintiff she should be taking her thyroid medication on an empty stomach. (AR 1303).

///

_____

[7]There are treatment notes from visits with cardiologist Dr. Menachem Wakslak in March 2022. (AR 1111-18). Plaintiff had an echocardiogram which showed a small pericardial effusion. (AR 1113, 1118). Dr. Wakslak planned to repeat the echocardiogram in six to eight months to ensure it did not increase. (AR 1113). There are no follow up notes from Dr. Wakslak.

In December 2021, Plaintiff's thyroid hormone was over 100 and Dr. Fink questioned whether Plaintiff was taking her medication. (AR 1302). Her other doctor, Dr. Yehuda Handelsman, planned to switch Plaintiff to a different thyroid medication. (AR 1302). On examination, she was somewhat tachycardic. (AR 1302). Dr. Fink noted that her thyroid functioning had "been a true puzzle," and he may try another thyroid medication to try to normalize her thyroid functioning. (AR 1302). In January 2022, he again noted that her thyroid functioning had been a puzzle as her labs were "off" again. (AR 1301). He wanted to see a list of the medications she was taking and more blood pressure readings. (AR 1301). Plaintiff brought in a medical disability form for Dr. Fink to complete, but he deferred to Dr. Levy. (AR 1301).

In February 2022, Dr. Fink noted that Plaintiff's creatinine had gone up and back down, so she was getting changes to her medication. (AR 1300). She had been prescribed Ozempic and lost some weight and her examination findings were within normal limits. (AR 1300). Dr. Fink noted, "[a] lot of her care is a puzzle, but she has done well." (AR 1300). Her kidney functioning was better. (AR 1300).

In April 2022, Plaintiff reported "large changes" to her medications – she no longer was on insulin, she had "large-scale changes" for the better in her A1c readings and thyroid function tests. (AR 1299). She reported she was feeling well. (AR 1299). In May, her examination findings were within normal limits. (AR 1299).

In July 2022, Dr. Fink noted that Plaintiff's thyroid numbers had been quite unusual requiring that he keep a close eye on Plaintiff's thyroid functioning, but her examination findings were within normal limits. (AR 1298). In August, Plaintiff reported diarrhea and some vomiting and weight loss due to an E. coli infection. (AR 1298). Her thyroid medication was decreased. (AR 1297).

In September 2022, Dr. Fink noted that Plaintiff's "activity status" was "very stable." (AR 1297). Dr. Fink continued to keep "a very close eye" on Plaintiff.

13

(AR 1297). Her glucose was too low and Dr. Fink did not realize she was on Ozempic, so he adjusted her medications. (AR 1297). In October, her blood sugar again was low, so Dr. Fink stopped one medication and Plaintiff's Ozempic. (AR 1297). In November, he adjusted Plaintiff's medications again. (AR 1296).

In December 2022, Dr. Fink reported that Plaintiff had reversed her diabetes with weight loss, had "done amazing," her renal functioning was stable, and her examination findings were within normal limits. (AR 1295). He decreased her thyroid medication given her weight loss and lowered thyroid hormone levels. (AR 1295). In February 2023, Plaintiff reportedly wanted to get off medications she no longer needed. (AR 1294). Her examination findings were within normal limits. (AR 1294). Later that month, Dr. Fink reported that Plaintiff was not taking her thyroid medication and her thyroid hormone level was high as was her creatinine. (AR 1294). He instructed he to take her thyroid medication. (AR 1294). In April, Dr. Fink noted that Plaintiff's lab work "many times is quite odd," and speculated that Plaintiff may not be taking her medications consistently. (AR 1293). With medication, her thyroid levels improved and Dr. Fink increased her dose. (AR 1293).

In May 2023, Plaintiff reported that she had increased her thyroid medication and her examination findings were within normal limits. (AR 1292). Her labs showed her thyroid hormone was high, so Dr. Fink increased her thyroid medication. (AR 1292). In July 2023, Dr. Fink asked for a new medication list since "things do change fairly rapidly" with Plaintiff. (AR 1292). Her thyroid hormone was still too high so Dr. Fink increased her thyroid medication. (AR 1291). Later in July, Plaintiff reported she had been hospitalized for hypercalcemia the cause for which was unclear. (AR 1291). She was "feeling fine at this point." (AR 1291). Dr. Fink asked Plaintiff to see her nephrologist and a lupus specialist because her creatinine levels were starting to climb and could be a factor. (AR

///

1291).  He also referred her to a specialist to rule out myeloma because her free light chains were elevated.  (AR 1291).[8]

In August 2023, Plaintiff reported her thyroid medication had been increased and Dr. Fink noted her blood pressures were "simply too low."  (AR 1290).  She complained of cervical and lumbar discomfort.  (AR 1290).  Later that month, Plaintiff had a rash over her buttocks improved with a topical medication.  (AR 1298).  Her labs reportedly were stable.  (AR 1289).  Dr. Fink described Plaintiff's case as "very complicated with frequently changing lab work," particularly her thyroid function tests.  (AR 1289).  Her examination findings were within normal limits.  (AR 1288-89).  Dr. Fink noted he would keep Plaintiff on name-brand thyroid medications to try to get some stability, but he thought compliance may be more of an issue.  (AR 1289).

In October 2023, Plaintiff's thyroid hormones were low so Dr. Fink decreased Plaintiff's thyroid medication.  (AR 1288).  In November, Dr. Fink noted that Plaintiff had "done well as far as her kidney function."  (AR 1287).

### 5.    Endocrinologist Dr. Eiriny Eskander

There are treatment notes from endocrinologist Dr. Eiriny Eskander from April, June, and July 2023.  (AR 1092-1103, 1224).  Plaintiff then was taking Ozempic and "fe[lt] well."  (AR 1092, 1099, 1224).  She denied fever, arthritis, gout, back problems, deformity, muscle cramps, muscle stiffness, restricted motion, and weakness.  (AR 1093, 1100, 1225-26).  Her in office examinations in April and

---

[8]Hematologist Dr. Christopher Ho evaluated Plaintiff and found myeloma was not obvious from testing.  He assessed plasma cell dyscrasia and iron deficiency.  (AR 1610-22; see also AR 1612, 1616, 1621 (noting other diagnoses of chronic kidney disease status-post transplant, iron deficiency/anemia, fatigue, monoclonal gammopathy, hypercalcemia, and malaise; but see AR 1611, 1615, 1620 (reporting that Plaintiff denied fatigue)).  She had no tenderness on examination, no rashes, and otherwise her examination findings were within normal limits.  (AR 1611, 1615, 1620).  Dr. Ho described Plaintiff as a "healthy 49 year old woman with distant history of renal transplant decades ago."  (AR 1610).

July reported findings within normal limits.  (AR 1101-02, 1226-27).  In July, Plaintiff reported that she had been hospitalized for chest pain and had an x-ray that was normal, she went to Las Vegas and went back home because she was having chest pain, and she went to the emergency room where she had an EKG and was told she has water in her lungs.  (AR 1225).  Dr. Eskander continued Plaintiff's medications, prescribed Ozempic, ordered labs, and instructed Plaintiff to follow a diet and exercise 30 minutes a day, five times a week.  (AR 1102-03, 1231).[9]

**B.      The ALJ Properly Considered the Medical Opinion Evidence; Substantial Evidence Supports the ALJ's Non-Disability Finding**

Plaintiff asserts that the ALJ erred in evaluating the medical opinions from Drs. Fischmann, Levy, and Dabel.  (Plaintiff's Brief at 9-19; Plaintiff's Reply at 2).

For claims filed after March 27, 2017 (such as Plaintiff's claim), new regulations govern the evaluation of medical opinion evidence.  Under these regulations, ALJs no longer "weigh" medical opinions; rather, ALJs determine which opinions are the most "persuasive" by focusing on several factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examinations, purpose of treatment, extent of treatment, and whether the medical source examined the claimant); (4) the medical source's specialty; and (5) "other" factors.  See 20 C.F.R. § 404.1520c(c)(1)-(5).

The two most important factors in determining the persuasiveness of medical opinions are supportability and consistency with the evidence.  See 20 C.F.R.

---

[9]Plaintiff reportedly was seeing Dr. Yehuda Handelsman before she started seeing Dr. Eskander.  (AR 1295, 1309).   There are no treatment notes from Dr. Handelsman in the record.  Prior to the most recent administrative hearing, Plaintiff's counsel advised the ALJ that Plaintiff had been treated by Dr. Handelsman and other doctors, and that the medical record would be updated.  (AR 1069).  Plaintiff's counsel followed up noting that there were outstanding records from other doctors and did not mention Dr. Handelsman.  (AR 1075).  After the hearing, counsel obtained additional time to submit records from doctors which did not include Dr. Handelsman.  (AR 1082, 1084, 1086).  Counsel advised that the record was complete before the ALJ issued the most recent decision.  (AR 1089).

§ 404.1520c(a).  ALJs must explain how they considered the factors of supportability and consistency, but need not explain how they considered any other factor.  See 20 C.F.R. § 404.1520c(b).

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant. . . objective medical evidence."  Consistency means the extent to which a medical opinion is "consistent. . . with the evidence from other medical sources and nonmedical sources in the claim."

Woods v. Kijakazi, 32 F.4th 785, 791-92 (9th Cir. 2022) (quoting 20 C.F.R. § 404.1520c(c)(1), (2)).  "[U]nder the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  Id. at 792.[10]

### 1.    The Opinion Evidence

Dr. Fischmann provided a California "Physician's Report on Disability" dated August 22, 2018.  (AR 357-59).  Dr. Fischmann noted that Plaintiff had a renal transplant secondary to renal failure secondary to lupus and that she has periodic infections, rejection, and joint pain.  (AR 357).  He noted that Plaintiff's joints were "remarkably preserved," and that she was "doing well with close follow up."  (AR 357).  Dr. Fischmann checked that Plaintiff currently was "substantially incapacitated" from performing her usual job duties, the incapacity was "permanent," and noted that Plaintiff "needed to have flexibility given her very complex medical condition."  (AR 358).  There is a handwritten note with this form

---

[10]The new regulations also eliminated the term "treating source," as well as the rule previously known as the treating source rule or treating physician rule, which formerly required special deference to the opinions of treating sources.  See 20 C.F.R. § 404.1520c; Woods, 32 F.4th at 792 ("The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant."); see also Cross v. O'Malley, 89 F.4th 1211, 1213-14 (9th Cir. 2024) (discussing new regulations).

in the record stating, "incapacitated based by lupus[;] lupus flared up – aggrivated [sic] [;] out of control, & makes her unable to work[;] look at j.d. [presumably job description] – he has to list want [sic] he [sic] cannot do[;] unable to concentrate on job task." (AR 356).  It is not clear who wrote this note.

Dr. Fischmann also provided a letter dated December 2, 2018, regarding justification for Plaintiff's "extreme disability." (AR 370-71).  Dr. Fischmann explained:

> The patient has had severe emotional distress and dysfunction in the
> course of the last 6 months and remains completely disabled.
> Unfortunately, the patient's medical history is extremely complex
> having struggled with systemic lupus erythematosus requiring very
> aggressive therapy and at one point actually was involved with regards
> to her brain and [she] was in a coma.  The patient's course ultimately
> led to kidney failure.  She is now successful in posttransplant and
> requires aggressive ongoing continuous monitoring on renal transplant
> medication with associated hypertension and secondary complications.
> She has already struggled with thyroid cancer.  At the age of 44,
> though she continues to function, the patient continues to be at
> extreme risk.  Severe stress and anxiety are factors that have
> unfortunately adversely affected her health.  It could easily exacerbate
> her recurrence of the lupus, increase her risk of infections, and given
> her immune compromised state this could be completely life
> threatening and life terminating.  Her ability to continue to function
> and maintain her kidney required [sic] that at this time she not work as
> she is going through the process of recovering.  The patient's
> restrictions include:  1) significant stress, 2) she is able to work for
> periods at a time though she requires intermittent ability to stand and

18

ambulate given her underlying history of lupus, and more importantly, very aggressive continuous oral hydration to avoid any risk to the renal transplant. She also requires need for appropriate sleep which can adversely affect everything else that is functioning.

(AR 370) (emphasis added). Dr. Fischmann then was seeing Plaintiff every 6-8 weeks, or sooner, to "very carefully" monitor her condition. (AR 370). (604-913)

Dr. Levy provided a California "Physician's Report on Disability" dated December 12, 2018. (AR 368-69). Dr. Levy noted that Plaintiff complained of low back pain, blurry vision, multiple joint pain, lumbar tenderness, wrist tenderness, knee tenderness, hip tenderness, and fatigue associated with lupus. (AR 368). He diagnosed lupus with renal failure causing a renal transplant and arthritis. (AR 368). Dr. Levy checked that Plaintiff currently was "substantially incapacitated" from performing her usual job duties, and that the incapacity was "permanent," explaining that Plaintiff would be unable to sit at a computer for long periods due to arthritis and severe fatigue, and that severe fatigue would limit her ability to work. (AR 368-69 (adding, "[Plaintiff] cannot compete in workforce because of serious disease")) (emphasis added).

Dr. Levy provided a letter dated July 31, 2020, stating that Plaintiff had been under his care for lupus status post kidney transplant, continued to show kidney dysfunction, was under "heavy medication" to prevent kidney rejection, and has secondary symptoms of weakness, fatigue, and difficulty concentrating due to her medications. (AR 467) (emphasis added). Dr. Levy considered Plaintiff permanently disabled. (AR 467).

Dr. Levy had previously provided a letter dated November 17, 1998 – 20 years before Plaintiff stopped working – stating essentially the same thing. (AR 468). Plaintiff had been under his care for "aggressive" lupus and suffered from renal failure resulting in a transplant and hypertension with secondary symptoms of

19

kidney dysfunction, weakness, fatigue, and difficulty concentrating due to her medications. (AR 468). He considered Plaintiff "permanently disabled." (AR 468).

Dr. Levy provided a "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)" form dated July 28, 2020. (AR 464-66). Dr. Levy opined that due to Plaintiff's muscle and joint pain and fatigue, Plaintiff: (1) could lift and carry up to 20 pounds occasionally and 10 pounds frequently; (2) could stand and walk about two hours in an eight-hour day; (3) could sit about four hours in an eight-hour day; (4) could sit 20 minutes at a time before needing to change positions; (5) could stand 10 minutes at a time before needing to change positions; (6) must walk around every 30 minutes for 10 minutes; (7) must be able to shift at will from sitting or standing/walking; (8) would need to lie down every two hours during a work shift; (9) would be able to occasionally twist, stoop, crouch, and climb stairs, but never climb ladders; and (10) must avoid moderate exposure to extreme cold and heat, and must avoid concentrated exposure to wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards. (AR 465-66). Dr. Levy explained that extreme change in temperature may flare Plaintiff's lupus, and she should avoid sunlight/UV exposure. (AR 466). Dr. Levy opined that Plaintiff would miss work more than three times a month. (AR 466). Dr. Levy noted that Plaintiff's renal dysfunction and lupus supported his findings. (AR 465).

Dr. Levy also provided a "Mental Impairment Questionnaire" dated July 28, 2020. (AR 462-63). Dr. Levy indicated that Plaintiff's medications may cause sedation, drowsiness, fatigue, lethargy, and malaise. (AR 462). Dr. Levy indicated that Plaintiff would have "moderate" limitations in understanding and applying information, interacting with others, persisting, and adapting and managing herself in the workplace. (AR 462). She would have "marked" limitations in remembering information, concentrating, and maintaining pace. (AR 462). Dr. Levy again opined that Plaintiff would miss more than four days of work per month. (AR 463).

20

Dr. Levy provided a physician's statement dated November 17, 2020. (AR 432-36). Dr. Levy reportedly recommended that Plaintiff stop working on September 20, 2018, due to joint and muscle pain limiting her ability to sit or walk. (AR 433). He indicated that Plaintiff: (1) could lift up to 20 pounds occasionally and 10 pounds frequently; (2) could sit for three hours a day, stand and walk less than one hour each a day, and drive one hour a day; (3) could not use her hands for pushing and pulling or power gripping; (4) could frequently bend, balance, use a computer keyboard and mouse, occasionally reach, and never squat, crawl, or climb; (5) would have moderate restriction in working with moving machinery, in cold climate, or around vibration; (6) would have mild restriction in working in a hot, wet, humid climate, around noise, and dust/fumes; and (7) could not use powered equipment. (AR 434). He reportedly had first seen Plaintiff in May 2003. (AR 436).

Consultative examiner Dr. Daniela Drake provided an internal medicine consultation dated June 11, 2019. (AR 381-85). Dr. Drake review medical records including an October 30, 2018 handwritten treatment note from Dr. Levy. (AR 384; see also AR 355 (note for rheumatology visit)). Plaintiff reported having lupus since age 15, a kidney transplant in 2001, thyroid cancer with thyroid removal in 2013, and osteoporosis. (AR 381). She had been able to work until September 2018. (AR 381). On examination, Plaintiff had a "somewhat cushingoid" appearance, abdominal bruising from wearing a waist tightening belt, a well-healed scar from her kidney transplant with fullness in her right lower abdominal quadrant consistent with a kidney transplant, back range of motion to 80 degrees on forward flexion, and otherwise findings within normal limits. (AR 382-84). Dr. Drake diagnosed lupus, status-post kidney transplant, osteoporosis, and hypothyroidism, all "managed" by medication, and steroid dependence with easy bruising and somewhat cushingoid appearance. (AR 384). Dr. Drake opined that Plaintiff would

///

be capable of light work with frequent pushing and pulling, and occasional bending, stooping, kneeling, and crawling.  (AR 384-85).

Consultative examiner Dr. Mary Bridges provided a complete psychiatric evaluation dated June 14, 2019.  (AR 386-91).  Dr. Bridges reviewed Dr. Fischmann's December 2, 2018 letter.  (AR 386).  Plaintiff reported having no psychiatric, mental, or emotional symptoms but did state that she has occasional situational nervousness.  (AR 386-87).  She said her ability to work might be affected by pain, movement limitations, and tiredness, which also limit her daily activities as tolerated.  (AR 387-88).  She was not sleeping well and felt tired or weak and took naps during the day.  (AR 387).  Dr. Bridges noted that Plaintiff was taking medications which can cause tiredness, weakness, sometimes dizziness, and dry mouth.  (AR 387).  Plaintiff's mental status examination was within normal limits apart from a generally euthymic mood and some anxiety with math calculations.  (AR 388-90).  Dr. Bridges diagnosed mild neurocognitive disorder due to sleep disturbance, general medical condition, and medication.  (AR 390).  Dr. Bridges opined that Plaintiff would have no limitations performing simple and repetitive tasks, mild limitations performing detailed and complex tasks, and no difficulties performing work on a consistent basis without special supervision, completing a normal workday or workweek due to her mental condition, accepting instructions from a supervisor or interacting with coworkers and the public, or handling the usual stresses, changes, and demands of gainful employment.  (AR 390).

State agency physicians reviewed the record, which included the consultative evaluations and Dr. Fischmann's letter, in July and October 2019, and found: (1) Plaintiff had no medically determinable mental impairment – Dr. Fischmann had not diagnosed or treated Plaintiff for a mental health condition, and the record did not support Dr. Bridges' diagnoses; and (2) Plaintiff would be capable of light work.  (AR 48-73).

Dr. Dabel provided a "Medical Opinion Re:  Ability to Do Work-Related Activities (Physical)" form dated July 26, 2023.  (AR 1246-48).  Dr. Pascal opined that Plaintiff would have identical limitations and issues Dr. Levy had found in his July 28, 2020 form (i.e., due to Plaintiff's joint pain, muscle weakness, and fatigue she:  (1) could lift and carry up to 20 pounds occasionally and 10 pounds frequently; (2) could stand and walk about two hours in an eight-hour day; (3) could sit about four hours in an eight-hour day; (4) could sit 20 minutes at a time before needing to change positions; (5) could stand 10 minutes at a time before needing to change positions; (6) must walk around every 30 minutes for 10 minutes; (7) must be able to shit at will from sitting or standing/walking; (8) would need to lie down every two hours during a work shift; (9) would be able to occasionally twist, stoop, crouch, and climb stairs, but never climb ladders; and (10) must avoid moderate exposure to extreme cold and heat, and must avoid concentrated exposure to wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards).  Compare  AR 464-66 with AR 1246-48.

Dr. Dabel also provided a "Mental Impairment Questionnaire" dated July 26, 2023.  (AR 1249-50).  Dr. Dabel opined that Plaintiff would have identical limitations as those Dr. Levy had found in his July 28, 2020 form.  Compare AR 462-63 with AR 1249-50.

### 2.    The ALJ's Decision

In determining that Plaintiff had a RFC for a range of sedentary work which would permit Plaintiff to perform her past relevant work, the ALJ considered and found "persuasive" Dr. Bridges' opinion that Plaintiff would have no more than mild mental limitations, as supported by Dr. Bridges' observations and consistent with the normal clinical observations noted by treatment providers and the lack of mental health treatment.  (AR 922).  The ALJ found "somewhat persuasive" Dr. Drake's opinion that Plaintiff could perform light work as supported by Dr. Drake's observations, but not fully consistent with Plaintiff's reports of fatigue which were

consistent with Plaintiff's chronic kidney disease and lupus. (AR 926). The ALJ further limited Plaintiff to sedentary work given her reports of fatigue. (AR 926). The ALJ found "somewhat persuasive" the state agency physicians' opinions that Plaintiff could perform light work as having some support given Plaintiff's lupus and history of renal transplant and reports of normal strength and gait, but again found Plaintiff's fatigue merited limiting Plaintiff to sedentary work. (AR 926).

The ALJ found "not. . . persuasive" Dr. Fischmann's opinion to the extent Dr. Fischmann offered conclusory statements about Plaintiff's ability to work. (AR 926). The ALJ found Dr. Fischmann's opinion that Plaintiff would need the option to stand and walk intermittently as having some support given Plaintiff's history of renal transplant, history of thyroid cancer, and ongoing need for multiple medications to address her conditions, but no support from Dr. Fischmann's own notes reporting that Plaintiff continued to do "remarkably well," her creatinine level was "excellent," and her most recent serologies were negative. (AR 926-27). The ALJ found Dr. Fischmann's opinion was not consistent with Plaintiff's conservative course of treatment for physical impairments and lack of treatment for mental health impairments, or with the evidence of normal strength and normal gait. (AR 927).

The ALJ found "not. . . persuasive" Dr. Levy's opinion to the extent Dr. Levy offered conclusory statements about Plaintiff's ability to work. (AR 927). The ALJ found Dr. Levy's opinion that Plaintiff would have "particularly severe limitations" (i.e., she would not be able to sit at a computer for a long period, could at most stand and walk for less than one hour each per day, could lift and carry no more than ten pounds, would have marked mental limitations in some areas of functioning, and would miss four or more days of work per month) as not adequately supported by Dr. Levy's general mention of tenderness, joint and muscle pain, and fatigue. (AR 927). Similar to the ALJ's findings regarding Dr. Fischmann's opinion, the ALJ found Dr. Levy's opinion was not consistent with Plaintiff's conservative course of treatment for physical impairments and lack of

treatment for mental health impairments, or with the evidence of no edema, no synovitis, normal strength and normal gait.  (AR 927).

Finally, the ALJ found "not. . . persuasive" Dr. Dabel's opinion suggesting work-preclusive limitations (i.e., sitting for four hours per day, standing and walking for two hours a day, missing more than three or four days of work per month, and having marked mental limitations in some areas of functioning) as having "limited support" for the physical limitations from Dr. Dabel's mention of fatigue and muscle and joint pain, and "virtually no support" for the mental limitations from Dr. Dabel's checking boxes and noting that Plaintiff's medication side effects "may" affect Plaintiff.  (AR 927).  The ALJ also found Dr. Dabel's opinion was inconsistent with Plaintiff's conservative course of treatment for her physical impairments during the period at issue and lack of mental health treatment, evidence of normal clinical findings including normal gait and strength, Plaintiff's denial of significant mental health symptoms during her consultative examination, and Plaintiff's denial  of fatigue at times to providers during the alleged disability period.  (AR 927).

### 3.   Analysis

The ALJ followed the new regulations in considering the medical opinions and substantial evidence supports the ALJ's conclusion that Plaintiff is not disabled.  First, the ALJ properly rejected statements from Plaintiff's treating physicians generally suggesting that she is disabled.  See 20 C.F.R. § 404.1520b(c) (such opinions on issues reserved for the Commissioner are "inherently neither valuable nor persuasive").

Second, the ALJ addressed supportability and consistency for the treating physician opinions, and substantial evidence supports the ALJ's reasoning for finding those opinions not persuasive.  As the ALJ noted, Dr. Fischmann's findings arguably were unsupported by Dr. Fischmann's own treatment notes reporting that Plaintiff's conditions were stable on medication, she was doing well, she had

remained free of issues from her lupus for which her profile was "completely negative," and she was walking one hour a day, four days a week. See AR 925, 927 (ALJ discussing same). Dr. Fischmann's findings were also not consistent with Plaintiff's positive response to treatment with medication. See id.

As the ALJ noted, Dr. Levy did not provide adequate support for his findings apart from general factors such as tenderness, joint and muscle pain, and fatigue. See AR 927 (ALJ discussing same). As detailed above, Dr. Levy's treatment notes report examination findings within normal limits, Plaintiff notedly was stable and doing well, she was negative for lethargy, she notedly had no lupus features at times and denied lupus flares, and Dr. Levy treated any pain she reported with Tylenol and supplements bringing her pain from 5/10 to 0/10. See AR 925-27 (ALJ discussing same). Dr. Levy's findings were also not consistent with Plaintiff's positive response to treatment with medication. See id.

As the ALJ noted, Dr. Dabel provided no support for his opinions apart from checking a box that Plaintiff's medications "may" affect her. See AR 927 (ALJ discussing same). As detailed above, Dr. Dabel's treatment notes reflect that Plaintiff felt well but had insomnia and fatigue at one visit. See AR 421, 489-93. Dr. Dabel's findings were also not consistent with Plaintiff's denial of fatigue at many visits, and positive response to treatment with medication. See AR 510, 523, 1093, 1100, 1225-26, 1253-54, 1259, 1263, 1269, 1280-81, 1611, 1615, 1620.

The consultative examiner opinions and the state agency physicians' opinions found Plaintiff would have fewer limitations than the ALJ's RFC assessment. These opinions, which the ALJ found somewhat persuasive or persuasive, furnish substantial evidence to support the ALJ's RFC assessment. See 20 C.F.R. § 404.1545(a)(3) (in determining a claimant's RFC, the Administration will consider medical source statements about what a claimant can still do, whether or not based on formal medical examinations). The Court will uphold the ALJ's RFC assessment, and the ALJ's related findings regarding the medical opinion evidence

as supported by substantial evidence and free from material legal error. Woods v. Kijakazi, 32 F.4th at 792.

Plaintiff disagrees with the ALJ's findings, arguing different interpretations of the evidence. (Plaintiff's Brief at 11-13, 15-16, 18-19). To the extent the record evidence is conflicting, the ALJ properly resolved the conflicts. See Treichler v. Comm'r, 775 F.3d at 1098 (court "leaves it to the ALJ" to resolve conflicts and ambiguities in the record). The Court must uphold the administrative decision when the evidence "is susceptible to more than one rational interpretation." Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995). The Court will uphold the ALJ's rational interpretation of the conflicting evidence in this case.

According to the vocational expert, a person with the RFC the ALJ found to exist would be capable of performing Plaintiff's past relevant work. See AR 949-51. The ALJ properly relied on the vocational expert's opinion in finding Plaintiff not disabled. See Barker v. Sec'y of Health and Human Servs., 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

For all the foregoing reasons, Plaintiff is not entitled to a remand based on the ALJ's consideration of the medical record and resultant RFC determination.

### C. The ALJ Gave Legally Sufficient Reasons for Discounting Plaintiff's Subjective Statements and Testimony

Plaintiff asserts that the ALJ's reasoning for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ found to exist is not legally sufficient. (Plaintiff's Brief at 3-8; Plaintiff's Reply at 1-2).

#### 1. Pertinent Law

When determining disability, an ALJ is required to consider a claimant's impairment-related pain and other subjective symptoms at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(a), (d). Accordingly, when a claimant presents "objective medical evidence of an underlying impairment which

27

might reasonably produce the pain or other symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of her subjective symptoms ("subjective statements" or "subjective complaints") are consistent with the record evidence as a whole and, consequently, whether any of the individual's symptom-related functional limitations and restrictions are likely to reduce the claimant's capacity to perform work-related activities.  20 C.F.R. § 404.1529(a), (c)(4); SSR 16-3p, 2017 WL 5180304, at *4-*10.[11]

When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's capacity to perform work-related activities.  See SSR 16-3p, 2017 WL 5180304, at *8.  In such cases, when there is no affirmative finding of malingering, an ALJ may "reject" or give less weight to the individual's subjective statements "only by providing specific, clear, and convincing reasons for doing so."  Ferguson v. O'Malley, 95 F.4th 1194, 1199 (9th Cir. 2024) (quoting Garrison, 759 F.3d at 1014-15).  This requirement is very difficult to satisfy.  See id. ("The clear and convincing standard is the most demanding required in Social Security cases." (quoting Garrison, 759 F.3d at 1015)).

An ALJ's decision "must contain specific reasons" supported by substantial evidence in the record for giving less weight to a claimant's statements.  SSR 16-3p, 2017 WL 5180304, at *10.  Generalized, conclusory findings do not suffice.  See

[11]Social Security Rulings "do not carry the 'force of law,' but they are binding on ALJs nonetheless."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009).  Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the term "credibility" from SSA "sub-regulatory policy[ ]" in order to "clarify that subjective symptom evaluation is not an examination of an individual's [overall character or truthfulness]. . . [and] more closely follow [SSA] regulatory language regarding symptom evaluation."  See SSR 16-3p, 2017 WL 5180304, at *1-*2, *10-*11.

Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (the ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony") (internal citations and quotations omitted). An ALJ must clearly identify each subjective statement being rejected and the particular evidence in the record which purportedly undermines the statement. Treichler, 775 F.3d at 1103 (citation omitted). Ultimately, the 'clear and convincing' standard requires an ALJ to show his [or her] work. . . ." Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to second-guess it. See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted). However, when an ALJ fails properly to discuss a claimant's subjective complaints, the error may not be considered harmless "unless [the Court] can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Stout, 454 F.3d at 1056; see also Brown-Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting claimant testimony "will usually not be harmless").

### 2.    Summary of Plaintiff's Testimony and Statements

Plaintiff testified that she could not work because she is tired. (AR 944). She explained that she has medical issues for which there is no cure, and she is always tired, has aches, and had just developed diabetes. (AR 944). She said she cannot stand for more than five minutes because she is tired, but has no trouble sitting in an office chair. (AR 944). She could pick up one gallon of milk but not two. (AR 945). She was taking several medications which she thought helped her, and denied any side effects apart from sometimes being "grossed out" and feeling like she wants to throw up. (AR 945). On a typical day she does nothing – she gets up, brushes her teeth, makes breakfast, sits down and watches television with her

dog. (AR 946). If she is okay, she will clean the bathroom with a lot of breaks. (AR 946). The majority of her time is spent at home apart from going to her doctor appointments or picking up prescriptions. (AR 946). She then was seeing five different doctors. (AR 946). She was not having any mental health treatment and said she did not have any mental health issues. (AR 947).

In contrast to her most recent testimony, at the prior hearing in February 2021, Plaintiff testified that she stopped working because she was "so sick," her joints were hurting. (AR 36). She said she was mostly seated during her job as an administrative assistant. (AR 36-37). She sat seven hours. (AR 37). Like her recent testimony, she said that fatigue prevents her from working, and she has back pain and aches, cannot concentrate, and is always tired because she cannot sleep at night. (AR 37). She said her thyroid cancer was in remission and her kidneys were stable. (AR 37-38). She said she has trouble standing due to knee pain and that she used to walk but no longer exercised. (AR 38). She could go to the grocery store and shop. (AR 39). She had trouble sitting in an office chair for longer than 20 minutes because her back starts hurting. (AR 39). She thought she could not do her former job because she cannot sit for a long time. (AR 40).

In a Function Report form dated April 19, 2019, Plaintiff had reported that her illness limited her ability to work in that she is tired, cannot sleep, has stress, and cannot concentrate. (AR 253-60). She stated she sometimes needed help getting dressed and bathing, and that her sister reminds her to attend to her personal needs and take her medicine because she forgets. (AR 54). Her sister prepared meals because Plaintiff was unable to do so. (AR 255). She did not do house work because she is tired and her swollen joints do not allow her to do anything. (AR 256). She did none of her own shopping. (AR 256). She could walk two blocks before needing to rest for up to three hours, pay attention for ten minutes, does not finish what she starts, follows instructions "pretty good," does not handle stress
///

30

well, and has a "fear of everything." (AR 258-59). Plaintiff's friend provided a Function Report form indicating similar limitations and abilities. (AR 266-73).

### 3.    The ALJ's Decision

The ALJ summarized Plaintiff's testimony and statements and found that while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the medical evidence and other evidence in the record. (AR 924). Specifically, the ALJ reasoned that the record did not support greater functional limitations, Plaintiff had managed her conditions during the disability period conservatively with medication, and there were inconsistencies with Plaintiff's statements and testimony in the record. (AR 924-26).

Regarding the record, the ALJ noted that just after the alleged onset date Plaintiff reported that she had no fatigue, no muscle weakness, no exercise intolerance, and she was walking one hour four days per week, and had normal gait and motor strength. (AR 924 (citing AR 523)). Dr. Fischmann had reported that Plaintiff continued to do "remarkably well," and her creatinine level was "excellent" post kidney transplant. (AR 924 (referencing AR 524)). In June 2019, Plaintiff had a normal internal medicine examination. (AR 924 (citing AR 381-85)). In October 2020, Plaintiff complained of achy joints and Dr. Levy noted that she was stable with no lupus features. (AR 924 (citing AR 424)). In February 2022, Plaintiff reported that she was feeling well and had not had any recent lupus flares, her creatinine was at baseline, and her hypertension was controlled. (AR 924 (citing AR 1189, 1195)). In August 2022, Plaintiff denied any lupus flares and denied any lethargy. (AR 925 (citing AR 1261, 1263)). Throughout 2022, Plaintiff's creatinine levels and eGFR readings were abnormal, but not in a range contemplated by the listings. (AR 925 (citing AR 1462)). In August 2023, Plaintiff denied fatigue. (AR 925 (citing AR 1634)). In November 2023, Plaintiff notedly was

31

doing "really well" overall.  (AR 925 (citing AR 1287)).  The ALJ concluded that the normal examination findings suggested Plaintiff retained the ability to perform sedentary work despite her impairments.  (AR 925-26).

The ALJ noted that Plaintiff managed her conditions conservatively with medication with a positive response inconsistent with Plaintiff's allegations of disabling symptoms.  (AR 925). The ALJ reiterated that Plaintiff denied fatigue, reported walking for an hour four days per week, and notedly was doing "really well."  (AR 925).  The ALJ concluded that Plaintiff's fatigue would not preclude performance of sedentary work.  (AR 925).  However, the ALJ did add postural limitations, pushing and pulling limitations, and environmental limitations to account for Plaintiff's joint pain, medication side effects, and any possible lightheadedness or balance issues caused by hypertension.  (AR 926).

### 4.  Analysis

The ALJ's reasoning for discounting Plaintiff's statements and testimony suggesting greater limitations than the ALJ found to exist is sufficiently specific and supported by substantial evidence.

### a.  The Medical Record

The ALJ permissibly could rely in part on the contradiction with the medical record to discount Plaintiff's testimony and statements. As the ALJ noted, although Plaintiff alleged she primarily could not work because of fatigue, she often denied fatigue/lethargy to her treatment providers.  See, e.g., AR 510, 523, 1093, 1100, 1225-26, 1253-54, 1259, 1263, 1269, 1280-81, 1611, 1615, 1620.  Additionally, her treatment providers regularly noted that Plaintiff was "doing well" and stable.  See, e.g., AR 392, 424, 428-29, 510, 524, 550-53, 1256-59, 1261, 1289, 1295, 1297.

"Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."  Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008); see also Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022)

("When objective medical evidence in the record is <u>inconsistent</u> with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.") (emphasis original).

### b. Plaintiff's Treatment

The ALJ also permissibly could rely on evidence suggesting Plaintiff's symptoms were managed with medication to discount Plaintiff's testimony and statements. Evidence suggesting a claimant's symptoms are managed or improve with treatment is a clear and convincing reason for rejecting disabling symptomatology. See Lapuzz v. Berryhill, 740 Fed. App'x 596, 597 (9th Cir. 2018) ("effectiveness of medication is a clear and convincing reason to discredit claimant testimony") (citing Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008)); Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); Brown v. Comm'r of Soc. Sec., 2021 WL 4078015, at *17 (E.D. Cal. Sept. 8, 2021) (that claimant's pain was reported to be well-managed and improved with medication is a clear and convincing reason to reject pain testimony).

Here, it was reasonable for the ALJ to discount Plaintiff's asserted limitations from fatigue and pain beyond those accommodated by the ALJ's RFC assessment given Plaintiff's reported ability to manage her conditions with medication to stability, denials of pain and fatigue at times, generally normal examination findings, and the lack of any need for more aggressive treatment.[12] The Court will not second guess the ALJ's reasoning. Thomas v. Barnhart, 278 F.3d at 959.

---

[12]The Court notes, for instance, although Plaintiff sometimes complained of aches and pain, the two instances in the record where Plaintiff complained of specific pains, she was instructed to take Tylenol and reported no pain or pain at 0/10 at her next visits. (AR 1261, 1264, 1266-69, 1274-75, 1282).

### 5. Conclusion

The ALJ stated independently valid reasons supported by substantial evidence for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ found to exist. The ALJ's stated reasons are sufficiently specific for the Court to conclude that the ALJ discounted Plaintiff's testimony and statements on permissible grounds. Moisa v. Barnhart, 367 F.3d at 885. The Court therefore defers to the ALJ's determination. See Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will defer to Administration's credibility determination when the proper process is used and proper reasons for the decision are provided); accord Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1464 (9th Cir. 1995).

Plaintiff is not entitled to a remand based on the ALJ's consideration of her testimony and statements.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: January 29, 2026

_____/s/_____
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE